Filed 9/23/15  In re D.G. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re D.G., a Person Coming Under the Juvenile Court Law. | B262209 (Los Angeles County Super. Ct. No. DK04294) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> CHRISTINE C., <br><br> Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Connie R. Quinones, Judge.  Affirmed.

Linda Rehm, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Jessica Paulson-Duffy, Deputy County Counsel, for Plaintiff and Respondent.

————————————

Christine C. (mother)[1] appeals from a dependency court dispositional order under Welfare and Institutions Code section 361, subdivision (c)(1),[2] removing her son D.G. from her care.  The evidence was sufficient to support the disposition order and we therefore affirm.

## BACKGROUND

### Petition

The Los Angeles Department of Children and Family Services (DCFS) filed a petition on October 9, 2014, alleging against mother under sections 300, subdivisions (a), (b), and (j), that she had physically abused her son D.G., then seven years old, by striking him with a belt and by making him stand in a corner for an excessive amount of time without allowing him to eat, drink, sit or use the bathroom.  D.G. had also shown suicidal ideation, telling mother he wanted to kill himself with a knife, but mother had failed to obtain the mental health services recommended for D.G.  Mother had been diagnosed with depression but had failed to take her medication as prescribed or obtain treatment.  She also had a history of violent and assaultive behaviors, including threatening to kill the children's school principal with a knife.  Mother's abuse of marijuana in combination with prescribed medication also endangered the children.  Mother had physically abused D.G.'s half-sibling R.W., who was currently a dependent of the juvenile court with sustained allegations that mother choked him and threatened him with a knife, and abused alcohol and marijuana.  Mother was not in compliance with the case plan or court orders in R.W.'s case.  Mother's behavior endangered D.G. and his siblings K.W. (eight years old) and S.W. (six years old).  D.G. had been placed in a group home, and K.W. and S.W. remained at home with mother.

The detention report described a September 22, 2014 referral stating that D.G. had been fighting and hitting other students at his school, and had left the classroom, returned

---

[1] R.W., K.W. and S.W. are not subjects of this appeal and will be mentioned only where necessary.

[2] All further statutory references are to the Welfare and Institutions Code.

to bang on the door, and slammed the door shut on the teacher's wrist when the teacher opened the door. D.G. tried to fight another student on the playground, and told a teacher who intervened that he would kill the student. Mother had been called in and became hostile, telling the school principal that she would not seek mental health services for D.G.

On October 1, 2014, D.G. was transported from school to Harbor UCLA Hospital on a 72-hour hold for being a danger to others and for "homicidal ideation." The school reported that D.G. said that no one was home the day before when he came home after school; he let himself in with a key left under the mat, and found only milk and juice in the refrigerator. No one checked on him and he did not know where his family was. D.G. was asleep in bed with no lights on when mother came home with his sister around 10:30 p.m. D.G. had began punching other children and had hit several of the school staff, showing no remorse and saying that he "'wants people to die.'" D.G. reported that he fights with his siblings every day, and when his eight-year-old brother K.W. threw a chair at him and knocked him out, mother did nothing. She also made him stand in a corner for two days, and she "'whoops'" him. The school staff was afraid of mother and D.G.'s adult siblings, who had made threats in the past resulting in a call to the police. The principal described D.G. as very aggressive, hitting teachers and students every day and trying to break a classroom window. When the principal contacted mother by telephone, she threatened to kill the school staff. Mother had adamantly refused to allow a referral of D.G. to counseling, denied any behavior problems, and blamed the school for singling out D.G.

D.G. told the social worker that he hit a female student after she hit him. He understood he was at the hospital for hitting other students, but he had told the school staff that he was being bullied, although he did not tell mother. Ten people lived in his home, and S.W. and K.W. hit him because he hit them. He liked to mess with them and hurt them because it was fun. Mother disciplined him by making him stand in the corner and not allowing him to sit down, sleep, eat, or use the bathroom. Asked if he wanted to hurt anyone, D.G. said, "'I wish she was dead. I want to lock her in the classroom and

3

make her stand up and not eat. I want to go behind her and choke her.'" Asked if he had "suicidal ideations," D.G. said, "'I want to stab myself with a knife. I have a knife downstairs at home.'" When he told mother that he wanted to kill himself with a knife two days earlier, she just told him no. He admitted slamming the door on the teacher, and said that the principal kicked him and the other students bullied him. D.G. denied domestic violence, physical or sexual abuse, or neglect at home.

The emergency room doctor stated that the police who transferred D.G. to Harbor UCLA reported that D.G. said he wanted to kill others, and that he told them on the way there "that he wanted to kill himself with a knife and cut himself on the leg and has thought about it for a month." D.G. confirmed that he wanted to kill himself. The psychiatrist stated that when he called mother she was uncooperative, saying that D.G. was being "kidnapped" by the school and the hospital.

When the social worker contacted mother and told her that D.G. had made statements about homicide and suicide, mother became irate, insisted that the school was picking on D.G., and said the teacher had made a false report. When called again, mother refused to give the names of the children's fathers and hung up.

The next day, October 2, 2014, mother came to the hospital with D.G.'s father[3] and demanded D.G.'s immediate discharge, but D.G. remained on hold and was transported to Del Amo Behavioral Hospital. Mother also went to the school and withdrew S.W. K.W., who has Down Syndrome, went to a different school but he had not attended since school began in August 2014; mother was also not allowed on that school campus because of her behavior and threats to the school staff.

The social worker on mother's case with R.W. reported that mother was not compliant with court orders regarding a drug program and drug testing, parenting and anger management classes, psychiatric evaluation, and counseling. Mother had

---

[3] DCFS was later unable to locate D.G.'s father Michael M. after due diligence, and he is not a party to this appeal.

4

unmonitored visits with R.W. but had not allowed DCFS full home access. Mother had a history of depression and anxiety, and took Xanax.

On October 6, the behavioral social worker at Del Amo stated that D.G. would be discharged that day with diagnoses of Mood Disorder N.O.S. and Oppositional Defiance Disorder, and weekly outpatient therapy was recommended. When called, mother stated that she would allow the social worker to come to her house the next day, and that D.G. was falsely detained: "'I will call Obama, I'm going to the council, I will make sure you guys have no job. I'll see you at 10 in the morning.'" Upon discharge, D.G. was placed in a group home.

On October 7, with mother present in the home, the social worker interviewed K.W. (who was unable to make a meaningful statement, but showed no bruises or signs of abuse or neglect) and S.W. S.W. stated that she was in the first grade, was not scared to live at home, slept with mother, and ate every day. D.G. would hit S.W. with a shoe, belt, and cord, and had hit her in the stomach, and she had a scar on her eyebrow from when D.G. hit her with a cord. Mother would hit D.G. with a belt when he didn't listen. The social worker observed that the home was in fair condition and had food in the cabinets. Three adult siblings were present, but mother stated they did not live there. Mother told the social worker that D.G. was not troubled, did not hit other children, did not hit his siblings, and never disclosed thoughts of suicide or homicide to her. She did not use physical punishment. As for D.G.'s statement that she made him stand in the corner for two days, he was "7 years old and does not know what 2 days are." The school principal was targeting D.G. Mother said she had a 20-year history of depression, attended Avalon Mental Health, and took Xanax prescribed by her regular doctor.

DCFS recommended that K.W. and S.W. remain home with mother and receive family maintenance services. As reasonable efforts to prevent removal, DCFS cited the court orders in the family reunification case for R.W., with which mother had not complied. Available services to facilitate the future return of D.G. included "Counseling, Case Management, Parent Training, Teaching and Demonstration Homemaker, Transportation, [and] Other Services." DCFS recommended monitored visitation for

5

mother with D.G., services for mother including individual counseling, a psychological evaluation, drug testing and education, and mental health assessment and services for the children.

**Detention Hearing**

A last minute information for the court reported that in August 2014 mother had taken D.G. to a children's clinic in Long Beach for a pediatrician appointment for blood work, at which mother stated she was concerned about D.G.'s hyperactivity and requested mental health support. Mother scheduled another appointment with a pediatrician, and called the clinic after D.G. was placed in the group home regarding mental health services for him; the clinic referred her to his school, and when she said she had disenrolled him, she was referred to Locke Wellness Center to sign a consent form and request an appointment.

At the detention hearing on October 9, 2014, mother was present. The court ordered mother to have S.W. and K.W. "brought back from 'Indiana.'" (In 1999, Indiana opened a case against mother because R.W., then a baby, tested positive for marijuana (THC).) D.G. was detained with monitored visitation for mother, and S.W. and K.W. were released to mother.

A last minute information on October 20 reported that when a social worker spoke with mother to confirm that K.W. and S.W. had returned from Indiana, mother stated that K.W. was home but S.W. was with her maternal aunt, although she did not know where. Mother was afraid to enroll the children in school because she feared DCFS would remove K.W. and S.W. She did not trust the department and did not need help raising her children. The court ordered R.W. placed with his father on October 22, 2014.

**Jurisdiction/Disposition Report**

In a report filed December 9, 2014, DCFS reported that K.W. and S.W. remained with mother and D.G. was in foster care. In an interview on December 4, D.G. stated, "'I said I wanted to cut myself with a knife, but not no more. I told my mom but she just told me "no." She didn't say nothing else. I said I wanted to kill the Principal cause she was lying on me and I was mad. But I don't want to kill her no more." He denied being

6

hit with a belt or otherwise, and said he had to stand in the corner "not for a long time." D.G. denied that his mother threatened school personnel, used drugs ("'Drugs is cigarettes and beer'"), or had a knife. Mother had hit R.W. to make him stop fighting with his sister.

On November 4, mother said D.G. had no problems at home and had problems at school only because he was bullied. The principal was targeting D.G., and she and her daughter never threatened school staff. She never hit D.G., but made him sit down and think about what he was doing. She denied leaving D.G. alone and doing anything to R.W. The DCFS case was unrelated to her diagnosis of depression. She did not need treatment but had attended the Asian Pacific Counseling and Treatment Center for a month. (DCFS was able to confirm that she was enrolled in mental health services.) Mother had smoked marijuana (for which she had a certificate) for 24 years because she did not want to get addicted to Xanax.

A school official, Dr. Alphonso Webb, was at D.G.'s school the day he was hospitalized and was concerned about his mental health and his "total disconnect." Many people had corroborated that D.G. beat up other kids and then denied involvement. Mother called the school and said she was going to shoot up the office; the school was placed on lockdown and police were notified. Mother's adult daughter came to the school, and was pacing and talking loudly. Mother denied she had been told that D.G. was being hospitalized, but a police officer said he called mother and told her. Dr. Webb also heard D.G.'s account of being home alone the night before. Dr. Webb had tried to support mother in the past, including helping her to change S.W.'s school.

D.G.'s first grade teacher said his anger issues were most severe out on the field, where he would get very angry and couldn't control himself. D.G. was not disrespectful to her, although his behavior seemed to have escalated over the summer. "He should have had counseling last year but his mother wasn't interested." The teacher thought he needed intensive counseling for anger.

The principal reported that she had called the school police twice, when mother threatened to shoot up the school and when D.G.'s adult sister threatened staff. D.G. was

7

not bullied; the other students reacted to D.G.'s aggression. D.G. had changed classes after he injured his teacher. He was "always frantic" and would target anyone, and was worse this year, with many episodes each day. He made some teachers so nervous that they threatened to quit. Although the staff offered services to mother the year before and made phone calls to set them up, she had refused or had not shown up. Two days before D.G. was detained, the assistant principal had to run across campus with a child D.G. had assaulted to get away from D.G. "I hope D.G. gets the help he needs."

D.G. said, "'I want to go home with my family.'" His foster parent reported that he had not had behavioral problems in his new school, but at home he was defiant, lied, bullied the younger children, destroyed property, and threw rocks on the roof and at the neighbor's dog. Mother now acknowledged that she needed to obtain mental health services for D.G.

Mother visited D.G. for eight hours on Thanksgiving (supervised by his adult sibling) and before visitation was in consistent telephonic contact. She remained in denial about D.G.'s mental health problems and lacked insight into how chaos at home may have contributed, including the violent altercation resulting in R.W.'s earlier removal from mother and placement in foster care. Mother had recently been more cooperative and receptive to services for K.W. and S.W.

DCFS recommended that the children be declared dependents; family reunification services and monitored visitation be provided to mother; mother continue her mental health services and complete parenting education; mother and D.G. receive family therapy; D.G. receive age-appropriate mental health services; and mother and D.G. cooperate with Wrap Around Services.

**Jurisdiction/Disposition Hearing**

Mother testified that she was unaware of the allegations against her. She denied that D.G., S.W., and K.W. were physically disciplined; instead, she would take a cell phone or toy away. She learned only today that D.G. said she made him stand in the corner; she had never done that or hit him or the other children with a belt. She knew D.G. had been sent to the hospital because "they said he wanted to harm himself," but she

8

had never heard him say that. When she arrived at Del Amo to pick D.G. up, DCFS took him into custody.

D.G. had attended the school for three years and was in second grade. The school had never contacted her about D.G.'s behavior or his getting into fights or hitting other children. Mother denied speaking to the principal or Dr. Webb about services for D.G., although she had complained about the principal to Dr. Webb. She had talked to D.G.'s first grade teacher about his being physically bullied by older children. Mother denied ever leaving D.G. alone at home. If D.G. were returned home, mother would change his school.

Mother denied that D.G. had mental health issues, but he might need a little counseling to help him trust adults again. Mother denied that she suffered from depression, but admitted to "trust issues." She currently took Trazodone and Xanax and had for about 20 years, and for a couple of months she had seen a therapist regularly at Asian Pacific. Mother denied that she or her adult children had ever threatened anyone at the school. She had a good relationship with the staff.

Mother denied she was even home when the violent altercation with R.W. had occurred. She smoked marijuana about every other day, but only in the garage or outside while the children were inside sleeping. She had had her marijuana card for five years.

Mother denied any concerns about D.G.'s behavior and denied he was aggressive. She stated D.G. had been bullied so she had taken him to the doctor to get him into counseling. She denied anyone at the school ever told her he had assaulted other children and denied that D.G. told her he wanted to hurt himself with a knife. She denied that the school had talked to her about counseling for D.G. She denied she had heard that D.G. was diagnosed with mood disorder or oppositional defiance disorder.

Mother testified that she smoked a blunt of marijuana about every other day and took Xanax on the days she did not smoke. Mother stated the doctor told her Xanax would do more damage and was more addictive. Her prescription was for 2 milligrams to be taken every day. She took Trazodone every once in a while for sleep, but didn't like it.

9

Mother denied that any of her adult daughters had created a problem at D.G.'s school. Anyone who said they had, or who said D.G. was the aggressor at school, would be lying. Mother denied Dr. Webb had informed her that D.G. was hitting children or that the police had informed her that D.G. was being hospitalized. She had switched D.G.'s classroom after she learned he was being bullied, and then went to his doctor in Long Beach to get counseling, which was just beginning when D.G. was removed.

Counsel for DCFS argued that mother was not credible in her denials of everything in the petition, given the many statements and evidence of what had occurred by school personnel, police, and doctors, including D.G.'s statements that he wanted people to die and that he wanted to hurt himself, mother's rejections of the school's offers of services, and her threats against school staff. Counsel for the children agreed that "[m]other's level of denial is very concerning," and that her use of marijuana and her prescriptions could make it difficult for her to respond to her children if she was sleeping. Services for D.G. had been offered over and over again and mother had refused.

Mother's counsel argued that DCFS had not established that mother used physical or excessive punishment on the children, given her testimony that she did not; given all her denials, all the allegations should be dismissed. Although DCFS claimed that mother failed to obtain mental health services for D.G., there was no current risk, as mother had done so just as DCFS removed the child. "She may not have followed through on the recommended timeline of these various doctors of the Department; however, mother did make attempts to the best of her ability." DCFS had also not established that there was a current risk that mother's depression made her unable to care for the children, as she was in therapy. Her use of marijuana did not put the children at risk because she smoked it out of the children's presence. Finally, although the allegations had been sustained as to R.W., mother denied she ever threatened R.W. with a knife.

The trial court dismissed the allegations of physical abuse of the children by mother and the allegation regarding her use of marijuana. The court found true by a preponderance of the evidence the allegations under section 300 subdivision (b) that mother endangered the children by her failure to obtain the necessary and recommended

mental health services when D.G. told mother he wanted to kill himself with a knife; by mother's failure to take her medication for depression as prescribed and her failure to obtain recommended mental health treatment; and by mother's history of violent and assaultive behavior against the school principal, the staff, and R.W. The court also found that mother's failure to obtain the recommended mental health treatment for D.G. endangered K.W. and S.W.

Counsel offered no further evidence before disposition. Counsel for the children argued that D.G. needed to be in counseling and services. Given mother's absolute denial, it was in D.G.'s interest not to return home, as she was ignoring and dismissing the many reports of D.G.'s aggressiveness and his anger issues. The other children were not at risk and could remain at home with mother. Mother's counsel argued that D.G. should return home, as the other children were not at risk and wrap-around services would be provided in the home with therapy once a week for mother and once or twice a week for D.G. With these services in place, someone could work with the family and with mother to create a safe environment. Counsel also argued mother did not need a drug program.

The court ordered K.W. and S.W. to be placed at home with mother. As to D.G., due to his difficulties there was a high risk if he returned home as "there is plenty of evidence here to show that he has some serious issues that need to be addressed and you [mother] were in denial as to what those issues were." The court found by clear and convincing evidence pursuant to section 361, subdivision (c), that there was a substantial danger to D.G.'s physical health, safety, protection, or physical or emotional well-being if he returned home, and no reasonable means to protect him without removing him from mother's custody. The court ordered D.G. removed from mother, found reasonable efforts were made to prevent or eliminate the need for removal, and ordered D.G. placed in foster care. Mother was ordered to participate in parenting classes, mental health counseling, individual counseling and anger management, and a psychiatric evaluation, as well as to take her medications as prescribed. The court granted mother monitored visitation and gave DCFS discretion to liberalize. The court also ordered wrap-around

11

services for D.G., as well as individual counseling and anger management, and continued the matter for a six-month hearing.

Mother filed a timely notice of appeal.

## DISCUSSION

Mother's sole argument on appeal is that there was insufficient evidence to support the removal of D.G. from mother's home. She argues that with services and supervision, DCFS could have ensured D.G.'s safety. We conclude that the trial court's decision to remove D.G. was supported by substantial evidence.

Section 361, subdivision (c) authorizes removal of a child from a parent's home only if the juvenile court finds by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or emotional well-being" of the child if returned to the home, and "there are no reasonable means by which the [child's] physical health can be protected without removing" the child from the parent's custody. "'A removal order is proper if based on proof of a parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent.'" (*In re A.S.* (2011) 202 Cal.App.4th 237, 247.) "'"The focus of the statute is on *averting* harm to the child."'" (*Ibid*., italics added.) "The parent need not be dangerous, and the child need not have been actually harmed before removal is appropriate." (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 146.) "[J]urisdictional findings are prima facie evidence the child cannot safely remain [in the parent's custody]" (*ibid*.), and the court may consider the parent's past conduct as well as the present circumstances. (*In re A.S.*, *supra*, 202 Cal.App.4th at p. 247.)

"The standard for review of a dispositional order on appeal is the substantial evidence test. [Citation.] In assessing this assignment of error on appeal, the substantial evidence test remains the appropriate standard of review, 'bearing in mind the heightened burden of proof.' [Citation.] We consider the entire record to determine whether substantial evidence supports the juvenile court's findings [Citation.] 'Clear and convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt.'" (*In re Hailey T.*, *supra*, 212 Cal.App.4th at p. 146.) We

12

review the record in the light most favorable to the dispositional order, and mother "has the burden of showing there is no evidence of a sufficiently substantial nature to support the court's findings or orders." (*Id.* at pp. 146–147.)

The record in this case contains sufficient evidence to support D.G.'s removal from mother's home. The evidence was strong that D.G. suffered from mental and emotional problems, including his violent and oppositional behavior at school, his statements that he wanted to hurt himself and wanted to kill the school principal, the multiple accounts of D.G.'s outbursts and violent behavior he displayed toward other students and toward school staff, his sister S.W.'s statement that at home he hit her with a shoe, belt, cord and in the stomach, and his lack of remorse and statement that he liked to mess with others and thought it was fun. D.G.'s behavior and his homicidal and suicidal statements led to a 72-hour psychological hold resulting in a diagnosis of mood disorder and oppositional defiance disorder. In the face of all this evidence that D.G. needed intensive help, the evidence and mother's own testimony showed that mother denied at every turn that D.G. ever acted aggressively or spoke of homicide or suicide, pretended not to even have heard of his diagnosis, and blamed all of his troubles on allegations of bullying unsupported by any evidence other than her statements. There also was evidence that mother refused to take advantage of offers of counseling for D.G., and her one reported attempt to get therapy for D.G. was for the purported bullying.

The court found that mother herself threatened school personnel and had attacked R.W. This jurisdictional finding was prima facie evidence that D.G. could not safely remain in mother's home. (*In re Hailey T.*, *supra*, 212 Cal.App.4th at p. 146.) Despite the sustained allegations in the earlier case, mother denied that she had threatened R.W. with a knife. Further, the court found that mother had not consistently addressed her own mental health issues. At the hearing, she denied that she suffered from depression, and the court made the jurisdictional finding that she failed to obtain the recommended treatment.

We agree with the trial court that "plenty of evidence" showed that D.G. had serious issues and mother was in denial, supporting a conclusion that there was a

substantial danger to D.G. if he was returned to mother's home. Mother argues that the trial court should have found that someone constantly in the home could keep D.G. safe. The court found to the contrary, ordering wrap-around services but still concluding that D.G. could not safely return home. At the dispositional hearing, mother still absolutely denied any concerns about D.G.'s behavior, and continued to state that he was simply a victim of bullying. This adamancy is additional evidence to support the disposition, as it supports a conclusion that mother's denial, resistance, and her own aggressive behavior would have rendered even intensive services insufficient to provide adequate protection and assistance for D.G. if placed in mother's home.

Substantial evidence supported the trial court's dispositional order.

**DISPOSITION**

The order is affirmed.

NOT TO BE PUBLISHED.


`                                                   JOHNSON, J.


We concur:


ROTHSCHILD, P. J.


MOOR, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.